## ROSS *v.* ROSS.

No. 7136. DECEMBER 11, 1929.

*Len B. Guillebeau,* for plaintiff in error. *A. R. Dorsey,* contra.

HINES, J. Edgar F. Ross brought a libel for divorce against Mrs. Cora M. Ross, on the ground of cruel treatment. The wife filed an answer denying acts of cruel treatment, and filed a cross-petition praying that she be granted a decree of total divorce. A second verdict was rendered on the plaintiff's petition, authorizing a total divorce between the parties, and finding that the plaintiff and the defendant should have the right to marry again. The jury also awarded $1,000 for permanent alimony. A first verdict on the cross-petition was awarded to the defendant. She made a motion for a new trial, containing only the general grounds, and sought to have the second verdict granting the husband a total divorce set aside. The court overruled the motion, and the defendant excepted.

The evidence given by the husband in this case to show cruel treatment is quite lengthy, but the sum and substance of it is, that the wife was exceedingly disagreeable in her conduct towards him;

that she was more interested in getting a part of his property than she was in him; that she frequently had her relatives in the house with her; that she talked to him roughly and rudely, was frequently cross; that she said to him that she didn't love him, that she despised him, that she would give years of her life never to see him again; that she wished he would leave the house, that he would go away and never come back; that the young sister of his wife and the husband of the former came there and had full possession of the house, from the front room to the cook-room, while the husband had to sleep in the back room; that he had been doing his own cooking for over two years; that the wife and her kinspeople would eat in one room while he ate by himself, and they did not invite him to eat a meal with them; that he was sick and in bad health, had to go to Florida in 1924 and 1925; that she nagged at him constantly and called him all kinds of names; she told him that she was through with him; a dozen times or more she told him she didn't love him, and more than once she told him she despised him. For two years he had been making up his own bed and looking after the linen, etc. She would not let him sell the home in which they were living, and told him she would kill him before she would let him sell the place. The plaintiff further testified: "She did not tell me she was afraid I would shoot her; she threatened my life. Sometimes she would get into one of her spells and say, 'I will kill you before I will let you sell this place and leave here.' I don't know how many times she told me she would kill me before she would let me sell the place,—more than one time. I don't think she ever told me that prior to the time I wanted to sell the house; in other words, we got along all right until I wanted to sell the house." Plaintiff also testified in regard to a pistol which he owned and which he said he bought during the race riot; that it was missing from where he kept it hanging on his bed. He inquired of his wife where it was, and she said she loaned it to a negro; when plaintiff asked her where the negro lived so that he could get it back, she told him he did not need it. On pressing her further, she said she would not give it back to him. He further testified: "Sometimes I go through the house and don't speak to her at all, and she will come in and speak to me. I will speak to her and she will nod her head." Much other testimony of the same character was given.

In our opinion the evidence in this case was sufficient to authorize the verdict granting a total divorce. "If a husband inflicts on the wife, by force or violence, bodily pain or suffering, and specially degrading pain or suffering, such as cowhiding or whipping, this would be cruel treatment; but this, and such as this, is not all that constitutes cruel treatment. The commission of acts which outrage the feelings of chastity and decency, such as threatening to commit or attempting to commit adultery, or cursing, abusing, or using insulting and opprobrious language, when done between husband and wife, whether by the husband to the wife or by the wife to the husband, in the knowledge, or coming to the knowledge, of both; these also, if persisted in and unatoned for, constitute cruel treatment." *Gholston* v. *Gholston, 31 Ga.* 625, 628, 633. "Cruel treatment, or cruelty in the broad and unrestricted sense in which it is used in our statute, is any act intended to torment, vex, or afflict, or which actually afflicts or torments without necessity, or any act of inhumanity, wrong, oppression, or injustice; for these or any of them, is the common understanding of the term; and upon this interpretation of the statute and the term, we hold that the acts specified in the libel as having been committed by the husband towards the wife constitute cruel treatment, considered collectively or singly." *Myrick* v. *Myrick,* 67 *Ga.* 771, 778. "Cruel treatment may exist from conduct other than blows. Mental anguish, wounded feelings, constantly aggravated by repeated insults and neglect, are as bad as actual bruises of the person, and that which produces the one is not more cruel than that which causes the other." *Glass* v. *Wynn,* 76 *Ga.* 319.

In *Ray* v. *Ray,* 106 *Ga.* 263 (32 S. E. 91), a libel for divorce by the wife was based upon the ground that the husband had circulated reports among his neighbors to the effect that the wife was untrue to her marital vows. In that case this court said: "It is difficult to conceive of greater cruelty that could be inflicted upon the mind of a virtuous woman than a circulation of such reports. The mental anguish thus occasioned would doubtless be more keenly felt and would produce more mental pain than could result from personal injuries by physical blows. Unquestionably such cruelty would not only justify a separation, but would sustain an action for total divorce." This court cited *Myrick* v. *Myrick,* and *Glass* v. *Wynn,* supra, to support the doctrine so laid down. In *Wilkinson*

v. *Wilkinson,* 159 *Ga.* 332, 339 (125 S. E. 714), Mr. Justice Hill said: "Under the allegations of the petition as amended, we are of the opinion that the petition alleged such acts of cruel treatment as, under our law, will authorize a total divorce. The learned trial judge said: 'From the days of Socrates and Xantippe, men and women have known what is meant by nagging, although philology can not define it or legal chemistry resolve it into its elements. Humor can not soften or wit divert it. Prayers avail nothing, and threats are idle. Soft words but increase its velocity, and harsh ones its violence. Darkness has for it no terrors, and the long hours of night draw no drapery of the couch around it. The chamber where love and peace should dwell becomes an inferno, driving the poor man to the saloon, the rich one to the club, and both to the arms of the harlot. It takes the sparkle out of the wine of life, and turns at night into ashes the fruits of the labor of the day.' He might have added the words of Solomon, 'It is better to dwell in the corner of the housetop, than with a brawling woman and in a wide house.' Proverbs 25:24." · This decision was followed in *Smith* v. *Smith,* 167 *Ga.* 98 (6) (145 S. E. 63).

Under the authorities cited and under the facts set out in the evidence in this case, the jury was authorized to grant a total divorce; and the trial judge did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except Atkinson and Gilbert, JJ., who dissent.*

BECK, P. J., specially concurring. I concur in the judgment of affirmance, being of the opinion that under all the evidence in the case and the deductions which the jury was authorized to draw from that evidence the verdict in favor of the defendant in error was authorized; but I do not concur in all that is said in the opinion. Mere "nagging" on the part of the wife will not authorize the granting of a divorce; but in this case the jury was authorized to find that the conduct of the wife was such as to actually impair the health of the husband and put him in fear that he was in actual danger.

ATKINSON and GILBERT, JJ., dissenting. After considering it, in view of the decision in *Ring* v. *Ring,* 118 *Ga.* 183 (44 S. E. 861, 62 L. R. A. 878), and the cases that follow it, we do not think that there is any evidence of cruel treatment in the sense in which those

words were used in the statute. In *Black* v. *Black,* 149 *Ga.* 506 (101 S. E. 182), the wife filed her petition for divorce and alimony, and sought divorce on the ground of cruel treatment. The acts of cruelty charged, as appeared from the plaintiff's own language, were: "The second morning after we were married I tied his tie for him, and when he came back to the house it was tied in a different way, and he said that Mrs. —— tied it for him, and that after she tied his tie over she threw her arms around him and kissed him. . . This had a considerable effect on my mind and feeling, made me feel very badly. . . The third night after we were married he wanted to retire between six and seven o'clock, and I said I wasn't ready to go to bed, and he says, 'You little blame fool, what you think I married you for?' He says, 'You do what I say do.' On that night he got up about eleven o'clock and reared around, cursed me, and abused me. . . He called me a blame fool, a little devil, and a damn fool. . . He said that his children were very much dissatisfied about our marriage, and he was the same way. . . On the second Sunday he asked me if I didn't want to go down to my home. . . He went to ride with Mrs. —— [a daughter of the defendant and a lady friend], and rode until after night." The plaintiff was made to feel unwelcome in the home. Defendant's children would have nothing to do with her. The plaintiff suffered a great deal mentally, and cried a great deal. The defendant abused her because she had sent a boy to him to collect an account from him. He repeatedly expressed the wish that she would return to her home; and finally, about five weeks after the marriage, "he told me to get my hat and leave; . . he says, 'I want you to leave on account of my children being dissatisfied.' He told me that he wanted me to take my hat and leave; the last time he told me this I took my hat and left. I did not give him any cause to treat me this way. . . I separated from Mr. Black on the 24th of March, and the baby was born on the 20th of December, 1917. . . Mr. Black has never done anything for me in any way, for me or the baby either, during the time I was confined." And in ruling upon the question of the sufficiency of the evidence in that case to authorize a divorce, this court said: "Under the ruling in *Ring* v. *Ring,* 118 *Ga.* 183 (44 S. E. 861, 62 L. R. A. 878), *Brown* v. *Brown,* 129 *Ga.* 247 (58 S. E. 825), and *Stoner* v. *Stoner,* 134 *Ga.* 368 (67 S. E. 1030), the evi-

dence failed to show a case of cruel treatment which authorized the grant of a divorce on that ground. The court therefore erred in overruling the defendant's motion for new trial." In the case of *Ring* v. *Ring,* supra, there is a clear statement as to the character of the evidence and degree required to establish the allegation of cruel treatment, and the acts of cruel treatment proved in the present case fail entirely to come up to those rules.

It is true that the defendant testified that the wife "threatened to kill him;" but any one reading this record will readily understand that this was an idle threat; all sound and fury, signifying nothing. The husband himself, who testified at great length, did not pretend in any part of his testimony that he had any apprehension that she would carry this threat into execution. In character it is very much like the threat of an angry mother who gives free course to her tongue and threatens her child with dire punishment and to "half kill him" if he does or does not do such or such a thing. There is not the slightest evidence to show that Mrs. Ross was ever guilty of any conduct that indicated that she would kill or "half kill" her husband, or inflict upon him any bodily hurt. In fact the husband does not charge in his petition that he was ever under apprehension of bodily hurt at the hands of his wife.

But there are portions of the testimony of the husband which we have purposely refrained from discussing up to this point, to which we must now advert. It is charged in the petition that the defendant voluntarily and without cause or reason "separated herself from the plaintiff during the latter portion of 1925; that she refused, for reasons unknown to plaintiff, to occupy the same sleeping quarters and to cohabit with plaintiff as husband and wife; . . that immediately thereafter she began to nag and abuse plaintiff by telling him that she did not love him, wished that he would get out, and that she would not live with him; . . that petitioner had never given defendant any cause or reason for her actions towards him; that her separation from him was voluntary, and defendant's interest in petitioner was only a monetary one." In portions of his testimony plaintiff in substance charges that the wife, though she continued to reside in the matrimonial domicile, wilfully, persistently, and without justification denied him all his conjugal rights, showing an intent to cast him off as her husband, and that from 1925 she had continued to deny him his conjugal

rights, and that he and she had not cohabited as husband and wife since 1925. Now, a denial by ·a wife of the conjugal rights of the husband with intent to cast him off as her husband amounts to desertion, where such conduct is continued for the statutory period of three .years. Code, § 2945 (7) ; *Whitfield* v. *Whitfield,* 89 *Ga.* 471 (15 S. E. 543). But in this case there is nothing to show that the refusal of conjugal rights had continued for the period of three years prior to the bringing of a suit for divorce, and the proof that the wife declined to cohabit with her husband will not authorize the grant of a divorce to him on the ground of cruel treatment. *Pinnebad* v. *Pinnebad,* 134 *Ga.* 496 (68 S. E. 73). Upon a review of the entire evidence in the case and the law relating to the questions presented, we reach the conclusion that the evidence did not authorize the second verdict rendered in this case.